18-5326 UnitedHealthcare Insurance Co et al. v. Alex Michael Azar II, in his official capacity as Secretary of Health and Human Services et al., at Balance. Mr. Shaw for the at Balance, Mr. Mirren for the Appellees. Good morning, Your Honors. May it please the being clear on what the overpayment rule actually requires. The rule provides that if a Medicare Advantage insurer gets paid for a diagnosis code and it later finds out that that code is invalid, the insurer can't just keep the money and pretend the error doesn't exist. It has to tell CMS and CMS will take the money back. The rule does not require insurers to audit all of their diagnosis codes or report every error, nor would that even be feasible. Now, UnitedHealth argues that the straightforward requirement is unlawful because the statute bars CMS from recovering for even the most egregious errors unless it first determines the relative error rates in traditional Medicare and in each Medicare Advantage plan. That would represent an extraordinary change to how the risk adjustment process works. Suppose CMS finds out that a beneficiary that an insurer reported is doesn't actually have cancer. Under UnitedHealth's theory, CMS can't recover the money it paid for covering a cancer patient unless it first audits both traditional Medicare and the Medicare Advantage plan to determine their overall error rates. And CMS would have to repeat that process for every single insurer if it wants to be able to collect for any errors from that insurer. Well, it has to do it once for itself and once for each of its contracting insurers. Right. But still, that would be an endeavor that has never before been attempted in Medicare Advantage. It would be a degree of auditing that's well beyond what CMS has ever done. I just want to point out that UnitedHealth doesn't apply any sort of similar limitation on insurers' ability to add new diagnoses. So, if an insurer discovers that this purported cancer patient actually has diabetes, the insurer is free to submit that diabetes code and collect payment for the additional code. And there's no requirement that the insurer demonstrate that its error rate is better than that of traditional Medicare. Practically, this means that in terms of medical record reviews, the sky is the limit. When an insurer finds an additional code, it can report it. But if CMS discovers an invalid code, it has to go through a huge process in order to collect payment. Mr. Shaw, there's a number of parts of your opposing party's brief that either make some kind of a factual empirical assertion about how things are done in this industry or says that an implication of your argument is that some fact exists. And I made a five or six of them. And I'm wondering if you can kind of maybe confirm or deny whether what they say is true or in some cases what they say you say is actually what you say. I'll do my best. The first is the claims adjudication audits in traditional Medicare remove only a minuscule portion of unsupported codes from the data. Is that true or is that false? I think it's a small fraction of codes and that is an inherent nature of the volume of claims that are submitted to traditional Medicare each year. And I would point out that the same is also true of Medicare Advantage insurers. In fact, we have evidence in when HHS's Office of the Inspector General audited one of UnitedHealth's member plans that in fact it wasn't conducting any auditing except for when it received a request for documentation from an external auditor. So that leads me to the next question. They say that, well, you just tell me if this is right or not right. Medicare Advantage plans do not need to reduce the error rate below the rate that CMS achieves through its claims adjudication process. Yeah, CMS has never imposed any particular requirement that ensures achieve a specific error rate whether that's an absolute or relative. It could be as low as CMS's error rate and that be okay by you. No, I don't want to say it's okay. CMS has never required insurers to achieve a specific error rate. That does not mean that insurers don't have obligations. They do have an obligation to have an effective compliance requirement. Would it be accurate to say that you require plans to do more than the claims review processes that are comparable to CMS's more or less? There are specific compliance obligations that are spelled out in detail in the Medicare regulations and that is what insurers are bound by. They're not being judged by any sort of specific error. I guess is it conceivable that what you require of Medicare Advantage insurers is a standard of error correction or error discovery that is more effective than CMS's? Again, I don't see how I can answer that question because the regulations require specific things like insurers have to have processes who are dealing with specific kinds of issues. These are sort of qualitative obligations that insurers have. It's impossible to compare that to say like what a Medicare administrative contractor does which is an entirely different program. The payment model is set up differently and so I can't say whether it's more or less. Go ahead. I don't want to interrupt your line of questioning if you had more. I do but I'm happy to go for it. Go for it. I'm going to switch a little bit. Imagine a rule that requires United to delete all unsupported codes. That rule would cause United to be underpaid. Is that true? No, it certainly is not necessarily true which I think is what United Health is arguing. They are arguing that the result is inevitable. Now that CMS imposes a 5.9% industry-wide coding intensity adjuster to offset the financial impact of plan coding activities such as chart reviews, plans have no choice but to engage in chart review. Do you think that's true? No, I don't think that's true. I have two more and then I'll get out of your way and out of my colleague's way. Coding errors occur in both directions so as a result the effect of overcoding and undercoding is a wash. I think it is true that the effects of undercoding and overcoding tend to offset each other. I want to be careful to frame it that way rather than to say it's a wash. They offset each other in a way that's roughly equal. I don't want to say that they are precisely the same but yes, in general the tendency would be for those effects to offset each other and there's no reason to predict a bias of one direction or the other. This is my last of these clarification questions. Although some unsupported codes will raise the value of other factors, the overall impact of unsupported codes in CMS's calibrating data set will lower the overall average value of the factors. I don't know that that's true and the reason is that it's very difficult to determine how changing the inputs to this regression model will affect the outputs. There are just a lot of effects that can occur depending on the particular mix of patients and how things work. I can't represent on a categorical basis what would happen but I think what we can say... Go ahead, finish your answer. One thing that's important to remember is that if there are lower codes and higher codes, that the effect on any particular insurer will depend on that patient's mix of beneficiaries. In fact, different insurers can have different outcomes based on the increases and decreases in relative factors based on each insurer's particular mix of beneficiaries. I had a question about that, just really trying to understand this program and how it works. I think the proposition was or the question was whether the overall effect of unsupported codes in the fee-for-service traditional Medicare is to lower the overall average value of the risk factor. I guess the question is whether an unsupported code... If FFS Medicare fails to code someone as diabetic, that could have a lowering effect at the margin on the value the risk factor is set at. If that diabetic is more than average expensive to treat, it could also have the effect of raising... At the very, very margin, we're talking statistical infinitesimal, but it could also have the effect of artificially raising the risk factor because the atypically cheap diabetic is not being figured in. So, one would have to have a theory that the FFS undercoding is skipping the expensive people and not skipping the cheap people in any diagnostic category. Unfortunately, again, it's very hard for me to say precisely how these effects will all play out. I think maybe the easier way to look at it is to think... I think everyone agrees that there is some overcoding and there is some undercoding. Now, I think that the aspect of this problem that United's hypotheticals leave out is that when Medicare Advantage insurers delete diagnosis codes by conducting a medical record review, they are also likely to add diagnosis codes. When they do that, there's no reason in particular to think that they are going to be underpaid as a result of both adding and deleting codes. In fact, we have lots of reasons to think that they will be overpaid because insurers structure these programs to generate revenue. There are lots of ways that they can go about them, whether it be chart review, whether it be in-home risk assessments, or something else. They are likely to structure these arrangements such that the overall effect will be to increase revenue more by adding diagnosis codes than insurers lose by deleting them. I appreciate that. Can I take you back to the statute? Is your primary position that the actuarial equivalence requirement simply doesn't apply to the overpayment rule? Yes. I think that's exactly right. The actuarial equivalence is an instruction to the secretary as to how to design the risk adjustment model. The requirements that are reflected in the overpayment rule are an aspect of that model. What an insurer is entitled to- Are they an aspect of that model? This is where I'm a little bit confused by your briefing. It seems like the risk adjustments are set annually based on a data set. Right. Yes. The relative factors change. Well, I want to be careful. Yes, they change regularly based on recalibration of the model. Right. The data that CMS has at the particular time that goes into that model is what it uses. UHC has not challenged the calibration of the risk assessment factors. Yes. I think that's exactly right. I think that is an odd aspect of this challenge, which is that the features that we're talking about are longstanding features of the risk adjustment model that have existed since its inception, the requirement of medical record documentation, the requirement to return payments due to invalid diagnosis codes. CMS-I'm sorry, United has brought up all these issues in the context of the how these substantive requirements interact with the procedural requirements of the Affordable Care Act. Yes. I think the far better posture for this case would have been to challenge those rates directly to say that they are too low because of the existence of errors or to challenge the design of the risk adjustment model as a whole. That's something that the insurer has an opportunity to do every year, but they haven't done that. They've smuggled that challenge into the context of a challenge to this very particular overpayment rule, which really just reflects broader substantive requirements. I think that makes the court's consideration of the issue much more difficult because if this had come up in the context of a challenge to the rates, then there would be more opportunity for the agency to examine the data and offer its expert analysis. Instead, it has come up in the form of a challenge to the omission of an FFS adjuster from this procedural provision. You, in your brief, you say, if we were to affirm the district court, we should do it on arbitrary grounds, on statutory grounds. I guess I wonder whether we can do that without first deciding whether and how the overpayment rule might implicate the statutory requirement of actuarial equivalence and, I guess, by the same token, the requirement of same methodology. Can you elaborate a little bit on how it is that you think we could reach an arbitrary and capricious claim without first somehow embracing their notion that the overpayment rule implicates actuarial equivalence? Yes. First, we obviously think that the rule is valid. I want to make that clear against all of the arguments that have been raised. To answer your question directly, I think the way that this court could go about it is to say that the specific challenge that has been brought is to the failure to include an FFS adjuster in the overpayment rule. And one of the arguments is that CMS failed to adequately explain its decision not to include such an adjuster in light of its decision to implement an adjuster in the context of a separate RADV audit methodology. And so, I think it would be straightforward. Which it decided at the end of the day not to do. Right. It decided and then, but it has, it preliminarily decided not to do, but that rulemaking and the study are still ongoing. But I think it would be open for this court to say that the agency simply failed to adequately explain its decision to implement the adjuster in the context of that audit methodology, but not implement it in the context of the overpayment rule. And that would be a straightforward basis for vacating the rule and remanding to the agency for further proceedings. And I would point out that this would give the agency an opportunity to complete, for one thing, the study that is trying to address the precise issues that are brought up by UnitedHealth and to- Is it trying to address the precise issues? I thought it was trying to address these RADV issues, which are different. You're right. I mean, so- This is where your briefing really, I have to say, really confuses me. Because when you say that the overpayment rule doesn't violate actuarial equivalence, it's consistent with it, it seems to embrace the notion that that requirement is applicable to the overpayment rule. And yet, it's not entirely clear to me how it could be applicable. And then in response to my prior question, you said, well, it actually, your primary position is that it doesn't apply. Right. So, I'm sorry for the confusion, but let me try to be as clear as I can. The specific FFS adjuster that was proposed and then CMS later preliminarily decided not to implement was in the context of this specific audit methodology. So, it would not apply of its own force to the overpayment rule. That was a sort of comprehensive audit methodology that would achieve or perform a level of auditing that has not to date been implemented in Medicare Part C. And that's contract-wide audit. Right. It's trying to, exactly. It's trying to correct- You need an example, audit it, and then extrapolate contract-wide. It's trying to correct every single error, which is not what the overpayment rule does. So, how would that study clarify the overpayment rule issue that UnitedHealthcare is raising here? That's what I'm not following the connection you're making. Right. The argument that insurers have made in that case is that the reason a FFS adjuster is required is that errors in traditional Medicare data cause the relative factors for Medicare Advantage to be improperly deflated or to be too low. And therefore, an adjustment is needed. So, although the specific adjuster that is discussed there is specific to that particular audit methodology, the sort of underlying effect that the insurers are claiming is the same as the one that UnitedHealth is relying on in this case. But that makes sense, because there they're challenging the risk adjusters. They're challenging the data that is the input for the risk adjusters, right? I mean, that was sort of the prior question I had for you, and maybe it's more a question for Mr. Maron, that they haven't here challenged the calculation of the risk adjusters. I think in that case, as in, well, I think it is at least one of the arguments that's being raised with respect to the new audit methodology, that an FFS adjuster is required for the reason that I specified, that the relative factors are too low, and therefore, an adjuster is needed. Right. On the risk assessment, the calibration of the risk assessment. Right. But I think that, right, they're obviously- The risk assessment, I'm sorry. Yeah. So, I think you're right. So, they are alleging that the risk factors are too low. I'm sorry, the relative factors are too low, and therefore, that CMS must implement an FFS adjuster to correct for those factors that are too low. And so, the empirical question that CMS could answer that bears on both whether an FFS adjuster is required in the context of the RADV audit methodology, and also on whether an FFS adjuster is required here, is whether that sort of decrease in that sort of deflation of relative factors actually exists. If it does, then obviously, that would tend to support the arguments on the insurer side. But if it doesn't, then I think that also undercuts the argument. So, I think that study has the potential to shed substantial light on the issues before this court. And I think the best thing would be to not short circuit that analysis, but to vacate the rule and remand to the agency as an opportunity to consider the issue further. You've kind of confused me, because if the actuarial equivalence statutory standard does not apply the overpayment rule, then whatever actuarial equivalence is being done on a contract-wide basis, which that I do understand, that they may say, oh, these adjustments are too low, too high, you're skipping the most expensive diabetics, or you're rolling them into the we don't, the standard, the base rate, and none of our people are base rate, and so whatever. But this tail wagging dog theory, where they're saying, and you can't collect from us in a documented case of overpayment until you rewrite your risk adjusters. Like, I thought your And then, but then when you say, well, we'll see whether they have it right or I guess one way of understanding it is they certainly haven't met their burden to show that overpayments are illegitimate because of some skew in the direction of the errors in traditional FFS. But the government, as a matter of accuracy, is going to, you know, might be investigating that under the RADV and FFS adjuster umbrella. Yes, I think that's a very good way of understanding the situation. I think what UnitedHealth has not come forward with any evidence that the effects that it's proposing actually exist. But to be fair, the evidence is in the hands of CMS. Right, and it's currently trying to study that question. These are not easy issues to answer. They require extensive study, and there's actually a tremendous amount of, there were a tremendous number of comments that were received in response to the study, and they deal with extremely esoteric topics about econometric analysis and regression modeling. And these are difficult issues to understand. And I think it really would benefit both the program and the court to have the agency be able to study that question and provide In the meantime, the overpayment rule would be not in effect. Right, again, we are not conceding that the overpayment rule is invalid, and I'm sorry if I gave that impression. Is it now, because of the district court's ruling, is the overpayment rule now suspended? Right, the agency is not attempting to enforce the overpayment rule at this point. But again, we are not conceding that it is invalid, but we are merely saying that if this court decides that it is invalid, that it should rely on reasoning that does not forever preclude the agency from ever recovering for any errors unless it first conducts a study of the relative error rates in traditional Medicare and each Medicare Advantage plan. We think that would be a huge change in how the program works, and it could not be what Congress intended when it was in effect. Sorry, Mr. Shaw. Judge Tillard, were you finished? I was just waiting for Judge Rogers. All right, go ahead, Judge Walker. No, please, Judge Rogers. I'm not asking questions, but, you know, if other people have covered them, I don't need to just hear my voice repeat them. I wanted to talk about a different adjuster, not the FSS adjuster, but the code intensity adjuster. And at one point in the brief, you say that it corrects not only for the unreported diagnoses that United discovers, but instead, and this is not a direct quote, but instead it corrects for net difference between additions and deletions. So, I just wonder where in the record I could go to confirm that. And I don't need an exact page, but just a hint for where to refer. I think that's sort of discussed in some of the notices about changes to the study that they used to initially calculate the amount of the adjuster. And what they did is they looked to the overall difference in risk scores between the two programs, rather than trying to account for any specific effect of, let's say, you know, insurers conducting medical record reviews or insurers having to delete diagnoses. So, it's a net difference. And I think that's a very important point to remember because it does not report to account for all of the over-coding, or I'm sorry, all of the sort of adding of diagnoses that insurers do. Rather, it takes into account the net effect of both adding and deleting diagnoses. So now, if insurers all of a sudden are no longer obligated to delete invalid diagnoses, then the coding intensity adjustment would not be enough to offset for the inflated risk scores. And in fact, it's industry-wide, right? It doesn't account for different practices by different insurers. Yeah, and that's also a very important point. And there are substantial differences in how different Medicare Advantage insurers conduct error correction. And so, there are certainly some on the most aggressive end of the spectrum where they are conducting extremely aggressive medical record reviews, and the effect of those would not be taken into account. Or, you know, it wouldn't be possible to compensate for with an industry-wide adjuster, but that is what is now specified in the statute. And I suspect the answer to this is no, but just to be sure, has the government taken any position in this litigation that's inconsistent with any position it's taken in False Claims Act cases? No, I think it's entirely consistent. And I think the False Claims Act litigation, I think, really illustrates some of the things that I've been talking about in terms of medical record reviews and how insurers try to generate both add and delete diagnoses when they conduct some type of rebuttal, if possible. Sure. No, we'll give you a minute on rebuttal. Anything further, though, from my colleagues? Not from me, thanks. Okay. All right. So, let us hear from Apelli. Judge DeRoggers, good morning, and may it please the Court. Good morning. On any reasonable reading of the terms actuarial equivalence and fame methodology, they require CMS to engage in a comparison of the two populations. In the overpayment rule, CMS refused to do that. Instead, it took the approach that in deciding whether a plan has been overpaid, all you need to do is look at the plan's data, see if there are unsupported codes in there, and if so, every single one of them is an overpayment, regardless of the rate in CMS's own data, in fact, without comparing the plans on any metric. And so, there was a discussion, Your Honors, with my colleague where I think he's got this with respect backwards. He says, we're saying we'll inevitably always be underpaid if this rule is legal. It's actually the opposite. The government is saying, no matter what, regardless of all the various factors that it outlined in its argument, even if the coding intensity adjuster fully offsets for a particular plan's coding activities, even if that plan has an error rate that's substantially below CMS's, regardless of any of this, it does not matter. I don't, as an agency, even have to ask those questions. I simply look at the plan's data. And what Judge Collier correctly understood, what CMS's own experts in the record said, what the American Academy of Actuaries told CMS, what its own post-judgment study found was, the presence of unsupported codes in their data, on average, reduce the average value of the payments they set. That's mathematically inevitable. But Mr. Marin, why is that not just an argument about the setting of the risk adjustment factors and, indeed, that's how the agency has looked at it, and that's what the RADV audit methodology is trying to get at, and that's what the FSS adjuster is trying to get at. All of that were clean and shiny, and there was a sense that the adjustments were made and that auditing was done on these samples and extrapolations were, you know, all the actuaries and the statisticians were happy that the extrapolation of error was done. Then you would still be arguing that one cannot identify individual overpayments because it all has to be done wholesale? I just don't even really understand your argument about how the agency would work under the regime that you're talking about. You come across an error in a claim. Somebody is identified as diabetic, and they're not. Their physician asked them, are you diabetic, and noted in the record, and the patient actually said no. So it's a mistake. You come across that, and because there's been a general auditing of data, it's your position that there's no place for an overpayment rule? So, Judge, thank you for letting me clarify that because I think my colleague in the government has completely caricatured our position. So I'd like to clarify. All we are asking is that the court rule in the same way Judge Collier ruled, which is this. The government, consistent with actuarial equivalence, cannot simultaneously both distribute its costs, set payments, over a set of data that contains lots of unsupported codes, and for that purpose distribute costs to unsupported codes, and then at the same time say every unsupported code in a plan's data is an overpayment. When you discover an unsupported code, you're equating something that's done in general as a statistical matter with something that's done in an individual case, which is why my question was, is it your view that only statistical plan-level corrections can be made? Because I want to know how you see these two codes existing because you don't like the way they've done it, but in my view what you're raising are arguments that really go to whether they have correctly calibrated the risk adjusters. And if they have, then they can look at application and whether they've accurately applied. And you're really, I mean, the way I'm seeing it, and you can correct me, this is why I'm engaging with you on this, is that you're saying, well, when CMS asks us to identify an overpayment and give back for that, we look at that as a business matter and sort of in the what, they have errors that are systemically skewed also, and so they can't ask for that? No, so Judge, no, I don't think that's my position. So if I might, and I recognize this was complicated. So there are two, there has to be, how you define an overpayment can't be approached without asking how are you paid in the first place. They go hand in glove. So there has to be parallelism. We don't object, the current rates, you're saying, well, why don't we sue about the rates? The current rates were set by correlating costs in CMS system to the presence of quotes in claims data. Those payment rates are perfectly adequate, so long as they're applied to a similar criteria set of data in the plans data. If you're going to correlate costs to the presence of codes and claims, that's fine, but then we're paid based on the presence of code and claims. But there's another way to do this that's much simpler, Your Honor. What Judge Collier said is you can't simultaneously take one approach on your side of one another, which means that on remand, there are two ways CMS can fix it, one of which avoids all the things they're concerned about, and I think that undergirds your question, Judge Pilley. CMS, and it would be not hard at all for CMS to do this. On remand, they could say, look, the way we're going to achieve equivalence is we're going to recalibrate our rates and figure out how much higher they would have been had we deleted unsupported codes first. And on an average basis, there's no question they would be higher. That's what their own post-judgment study found. They found that 79%, when they removed unsupported codes, they redid the data, 79% of the codes went up. The average value went up. I read the reply, Bruce. The difference is it's very much smaller than your brief makes out. So no, Your Honor. It was actually quite material. So they committed, let me explain. They found that 34% of their codes were unsupported. They ran a calculation trying to figure what the beneficiary impact of that was, and they committed a very basic mathematical error when they did that. They came up with 3%. It's, in fact, 14%. If Your Honor wants to look at comments on this, Footnote 5 in AHIP's brief points you to the rulemaking, where multiple experts pointed that out. But I would say, Your Honor, 3% in this program— But that's not this rulemaking, is it? No, it's not. No, it's not. This is the basic threshold question. Why don't you explain to me, on remand, your two different scenarios in which we got a little bit sidetracked, in which you think how they could fix this? Okay, so I think Judge Collier said it. Okay, number one, and this is the one that Judge Collier in Footnote 9 said was the preferable approach, was to figure out its rates using only supported codes. It's not hard. It runs this model once every few years. All it has to do is take a robust sample of its data and, at that point, figure out what an appropriate payment amount is for data that doesn't contain unsupported codes. If it does that, Your Honor, then all this goes away. At that point, every single code that the plan identifies is absolutely an overpayment. Why? Because they were paid on the system with computed costs based on supported codes, and if you've got an unsupported code, of course it's an overpayment. More than that, CMS, at that point, could affirmatively make you look for the codes. It would be able to bring false claims to that case without doing audits, plan-wide audits. It would do audits of no plan. All they would have to do is one audit of itself every few years to set the rates. And, Your Honor, I think it's important to say this would also be retrospective. The overpayment rule in Subsection F has a six-year look-back provision. Nobody challenged that. So, if on remand they take this route and this is how they decide to fix to achieve equivalence, that will have, they can make you go back six years. So, this is, solves all their problems that they seem concerned about. The only response, Judge Pillard, on this proposal of ours in their brief, with respect, makes no sense. It's a carryover sentence or two between pages 23 to 24 of the reply brief, and they say that if they were to audit their data, it would then introduce an inequivalence or a mismatch because their data would be, at that point, audited and ours would be not. Not at all. We're saying if you do that route, if you go that route, that option one, you can make us audit our entire data. There wouldn't be a mismatch, and there wouldn't be all these issues. The only issues that are occurring here, Your Honor, is that for now, CMS is, for now, CMS has not done that option. The second option that CMS could choose to do, which would be entirely its judgment as a policy matter, it might decide, Judge Pillard, that it actually prefers, I actually think there's a chance of this, they might prefer as a policy matter a world in which they continue to set payments the way they do now, in which they use, both because it's simpler to do it and because it results in lower upfront payments, and that the way instead they will achieve equivalence is through some kind of adjustment mechanism. Now, I agree, Your Honor. If that's the route CMS chooses, at that point, in order for a plan to know it's been overpaid, there would have to be auditing done to determine the rate of unsupported codes in its data. But that would only happen if CMS made the policy determination that of the two options, it prefers that method. But that's where it is now, and that's what you're saying. That is the world today, right? So basically what you're saying is, right, under the world today, where they continue with setting their payments as they do now, without doing a super comprehensive audit, and then they have, or they don't have the adjustment that you're calling for. That's what the RADV and the FFS was about. So my question is, that's a different case and a different rule. No, it's a whole RADV thing. So it is your view that the only way they can have an overpayment rule is if they have, let's just call it perfect data. That basically is your position. No. So one option would be, if they recalibrate, that's option one. Option two would be, if they create an adjustment mechanism, tell plans what their rate of error is that are built in, and create a mechanism for a plan to know at that point, okay, I see an unsupported code. Does that mean I've actually been overpaid? And the math here, Your Honor- So wait, wait. So that's the step that I'm missing. So they have what they currently have, and there's an adjuster. And the adjuster is where? Because then how would you know when you have an overpayment, whether it's already taken account of in the adjuster or not? There's no such thing in your worldview in that scenario for an individual overpayment problem, right? Because it's all dealt with on average. No, not at all, Your Honor. It could be absolutely identifying an overpayment. So let's say, Your Honor, that CMS- I mean, there's multiple ways that plans have proposed how this adjustment could work. This is something that the agency would decide on remand. And as I said, it would still be able to fix it for six years going back. So this is not in perpetuity. But let's say, Your Honor, a plan has looked at its data and says, 25% of my codes are unsupported. And it turns out that 20% of CMS's codes are unsupported. Then that means the plan has been overpaid by that difference. Whoa, whoa, whoa, whoa, whoa. You're making an assumption about unsupported codes and which direction they go. We need a lot more data to figure that one out, right? No, I don't think so, Judge. With respect, if you hold everything else constant, with respect to unsupported code, mathematically, there really is no disputing what the average impact is. If I was given a fixed amount of costs, that's what CMS has. If I distribute them across more codes, the value of an average condition has to go down. And the way you know that is- I just don't even follow that because you don't double count individuals. Either I'm an individual with diabetes or I'm not, right? And if I'm not, then I'm at the base rate. And if I'm an individual with- and I'm in traditional fee-for-service, and I'm an individual with diabetes, then I'm at the base rate plus, right? I mean, it's not like you're creating more people. No, but that's exactly the point. So you're a fixed number of people, you have a fixed number of costs. What this model is asking is, Mr. Marin, what is the average incremental impact of having a particular condition on the expected cost of insuring it? The overwhelming driver of that question, in a universe where the number of people are fixed and the per capita cost is fixed and known, say 10,000 per person across the population, how many conditions do I have? If I have four conditions in my data per person, the average cost of a condition across the whole system is $2,500. None of that. That seems totally wrong to me. Well, Judge, I mean, it's basic division, and it's what their own study found. 79% go up when you remove unsupported codes. You're dividing by cost. You're asking, and the other way you know it is because the way they're- Wait, wait, wait. Let me just do this in common sense terms. So I'm a CMS, and I'm doing fee-for-service. And a bunch of the doctors, because they're just doing services, they're not necessarily scrupulous about whether they say the person's diabetic or not. And so let's say 25% of the people that are getting fee-for-service under traditional Medicare aren't identified as diabetic. 25% of the diabetics aren't identified as diabetic. So the adjuster is set based on the 75% that are coded as diabetic. We don't know whether in that 25% that are not coded as diabetic, whether there are a lot of people who are cheaper than average to treat or a lot of people more expensive than average to treat. And I would think, I mean, just again by hypothesis, that they're probably the people that are cheaper than average to treat because their diabetes is not front and center when they're going to the doctor. And so actually the under-coding or the failure to code there is having an upward effect on the rate adjuster. No? No. I think your honor is conflating two types of errors there. And if I may try to unpack that, under-coding and over-coding, and there's two very different issues. Unsupported codes, which is the issue dealt with by the overpayment regulation, deals with a situation where the code was submitted. So there's a diagnostic code for diabetes, but the code is not in fact in the medical chart. Namely the person, so the person doesn't have diabetes. So exactly for all the of adding these of the presence of these codes of people whose code says diabetes, they don't actually have diabetes, is to dilute the average cost of diabetes when CMS calculates it. Because it's distributing the actual cost it incurs over a set of people, some of whom do not have the condition. But this is the code being submitted, that only happens on the MAO side because that's how the MAOs get paid. On the FFS side, you're getting paid for service. And what you're saying is, yeah, but the services that this expensive pillard is getting are not being understood as services for a diabetic because the doctor failed to put that in the code. Or conversely, called her diabetic because they talked about her parents' diabetes in a session and that she doesn't have it. It could be either way, that there's a ton of error where there's unsupported codes, or I guess this is your point, that the unsupported codes is a one-way problem. And I'm So if FFS has both unsupported codes and failure to code, those are both errors. And what I haven't seen, and it's your burden, what I haven't seen is any evidence or statistical analysis that says given error in traditional FFS, it's much more likely that we're going to have unsupported codes. No. But the one you don't like is failure to code. Right? And when FFS does it, what you're worried about is failure to code because, well, again, we don't know whether the person you failed to code is above-average expensive or below. So there are these two issues. You asked, Your Honor, if there are these codes in Medicare. Absolutely. Even though Medicare providers on traditional Medicare are generally paid for to submit the codes, and that's how CMS runs its data. Now, the reason that, with respect to these two types of errors, is the issue of over-coding relevant? Or, I'm sorry, of under-reporting. So you say, well, maybe in CMS's side, there's some under-reporting going on that's offsetting. But there's two things there. Number one is CMS already accounts for that. That's what exactly the coding intensity adjuster does. It says, we, on CMS's side, have more unreported conditions. Our data is less complete than yours, and we account for that. And, Your Honor, when you consider, and so it's already accounted for. Now, the government seems to say two different things about that. One, it says is, well, maybe the coding intensity adjuster is too low on an average industry-wide basis. That's an extraordinary claim to make, because they set it at a minimum. If the Congress sets a minimum, they can go as high as they want. If the coding intensity adjuster is too low, they can account for it. So what they really are saying, in a more sophisticated way, is that it's set on an average basis. So for some plans who are more than average, it's undercompensating. But, of course, by the same token, necessarily, half of the plans, they're overcompensating, because half of the plans will be, by definition, if you're setting an average amount, you're over-adjusting for half, and you're under-adjusting. Or they're setting it low, because they don't want to do that. And then they have to deal with the practices of plans that are more aggressive in finding code. Well, so CMS is under obligation to set it correctly in a JA-212. You just explained why there is no one correct. No, no, no, no, no, no. On an average basis, there is one correct. Yeah, average. On an average basis. So if the issue is particular plans might be more aggressive than average, and that's an offsetting factor, fine, that's something they can account for. We have no objection to that. On page 49 of their brief, in the opening brief, they basically said, and came almost to admission, that in order to know in a particular case where there was an overpayment, you have to compare the relative rates of under and over-reporting. Fine, do that. That's not inconsistent whatsoever with our position. Now, but they don't do that. Now, a couple of things, Your Honor. The government said that its FFS adjuster for RADV is just a proposal. That's actually a complete misdescription. It's a 394 of a joint appendix. It was a final methodology. It was proposed at 292, where they put it out for comment. Their current position is you have to, that in order to know, which CMS' own position, currently as we speak is, in order to know if a plan has been overpaid, you have to compare the relative rates of error. There's a proposal to change their view on that, and that's fine, but the current position of the agency is that way. Now, they also said, with respect to- You're talking about RADV and the FFS adjuster? Correct. Now, in RADV. Now, in the coding intensity adjuster, Your Honor, this is a JA-177-178, because we're saying, look, there's two types of errors, and I agree with that. Consider how drastically different CMS' treatment is of one type of error versus the other. When it comes to an error that works against its favor, it would have plans paid more compared to CMS, which is the issue of under-reporting. CMS says at 177-178, and it quotes all the congressional committees, that in order for the payments to be accurate, it has to account for that differential. But even though the codes that plans are adding are accurate in an absolute sense, because they're supported by the medical charts, if CMS doesn't account for the practice of plans to add codes when CMS does not, it will lead to inaccurate payment, because you have to have consistent risk scores across both programs. If Mary Jane is a 1.0 when she's on CMS, she needs to be a 1.0 when she's on Medicare Advantage for the payment to be accurate. When it comes to this other type of error, where an adjustment would be to our benefit, suddenly it adopts an absolutist stance. Which type of error are you talking about now? Unsupported codes. The FADV? No. The issue of unsupported codes that are identified... Overpayment rule. Yes. When it comes to that kind of issue, we're not going to make an adjustment, we're not going to even compare. This is where I just don't understand what your theory is of how actuarial equivalence applies. Actuarial equivalence, as I read the text of the statute, is about the setting of the risk adjustment factor. It seems like you're really doing this tail wagging the dog where you're saying, you come after me for an overpayment. I acknowledge that actually this person doesn't have diabetes, but you can't come after me for this individual overpayment until your records are all clean. Because maybe if my payments are rendered more accurate by... My recovery from the agency is rendered more accurate by relinquishing overpayments, I will actually be underpaid because of a systemic inaccuracy in the risk factor, right? Sure. And the question is, why isn't that just a case about the accuracy of the risk factor? Why is this coming in through the tail of the overpayment? I mean, you've never objected to overpayments until the Affordable Care Act says that you have 60 days and if you find it, you have to tell us. That's the procedural part that Mr. Shah is talking about. I just don't see a world in which... You didn't actually get to finish your second example, which is the situation where there is imperfect data on both sides, there is an adjuster, and then how could there also be an overpayment rule? There couldn't, could there? Absolutely there could be. I don't understand that. Because if my errors exceed those that were assumed in the model, then... Well, in the payment model, if it exceeds that adjustment amount, then absolutely. And that's the concern here, that if a plan is jacking up its codes, it's creating errors that are different than those in CMS's data. Then the problem is, at that point, its data overstates the health of its population compared to CMS, because CMS spread its costs over a certain number of codes and now you've got more errors on yours. They can absolutely address that by doing it. Again, I think the simpler and better approach is to adjust the rates and it can do it going back. In terms of a statutory question, the way they're linked, Your Honor, is this. The overpayment statute says an overpayment is funds to which you're not entitled under the Medicare program. So then that asks the question, it begs the question, what are the equivalence provision says? I understand your policy argument that that would be perhaps permissible, although that would be perhaps permissible if CMS said, we want to do it that way. No, I think the statute really requires it. I think so, Your Honor. So first of all, the statute says the secretary shall adjust the payment amount. The payment amount shall adjust the payment amount to achieve actual equivalence. The CMS consistently, in all the briefing below, and I don't see it disputing it here, says what actual equivalence means is that the payment has to be equal to, they have to pay plans the same as they would expect to incur to insure an identical person. Right, and we're talking in gross. They adjust the payment amount by the risk factors in the general system. Right, but the payment amount is always distributed per person, just so you understand. Right. Right. And so what they're saying is, if it costs them on average $1,000 for diabetes, as long as they set that payment amount at $1,000, they've satisfied actual equivalence, and now you give back $400 on the back end, so you're left with a net $600, no inequivalence. That cannot be right. No, no, but there's no inequivalence because, A, you've never shown that there's anything statistically significant about the errors that you're assuming are in their database. So we don't have a reason not to think that this isn't your scenario one, as opposed to your scenario two. Right, it's your burden. So if there's some statistical significance in the direction of the errors in the FFS database, and that it's actually relevant to the condition that you're talking about, no showing on that. And I understand you don't have the data. It's a CMS data, but it is your burden to establish that. And I see no statisticians in the record saying anything about that. I mean, it does seem like, and that's why I keep coming back, because this seems like a complaint about the RADV system and the FFS adjuster. That's where all the arguments- Your Honor, when you say there's nothing in the record, the American Academy of Actuaries of 392 told CMS the presence of unsupported codes in its data have the effect of lowering the payment amount. At JA601, the head of CMS's entity that is in charge of payment and overpayment recoveries, Jennifer Harlow, analyzed and agreed that plans would be underpaid if you recovered every single- It's not about RADV. This is not about overpayment rule. We don't have anything challenging the overpayment rule on these grounds. We have no evidence. But Your Honor, the math is the same. In other words, if the only difference between an overpayment and this is that in RADV, they say we're extrapolating all the errors, and here it's just identified. So let me address that, because I think the government's being very disingenuous. Your Honor, the government is suggesting that because Judge Collier has vacated the definition of identify, that now, my colleague said, that there's no requirement that you affirmatively look for errors. All we're saying is if you already have discovered them. That is absolutely disingenuous and directly contrary, once again, to representations the government made below. So the government moved to dismiss when we filed our complaint for lack of standing. And what it argued was that even if the definition of identify were completely eliminated to eliminate any requirement to exercise reasonable diligence and affirmative compliance, that would do nothing. It would do nothing to alter a plan's affirmative obligation to look for overpayments, because that would independently exist by virtue of 42 CFR 422.503B4VI, which is... All right, Mr. Marron. Yes. All right. We're way over. Judge Walker, do you have any further questions you want to ask, Mr. Marron? I do. How about two? Because I know we're way over. But the government says that the coding intensity adjuster factors in overreporting and underreporting. And Mr. Shaw gave me a page to go look at to confirm that. Do you disagree with that? I do. First of all, there's no evidence... Where do I go to look for confirmation that you're right? Well, so first of all, in page 11 of their opening brief, they said the exact opposite. They said that the coding intensity adjuster does not account for plan's treatment of unsupported codes. Flat out, that's what they said in page 11 of their opening brief. But Judge Walker, I think the more... I'm not asking you to make a factual finding. Our point legally, however, is that all they're really saying there is another version of the coding intensity adjuster might be too low if you are a plan that is removing a lower percentage of codes than the industry average that's built into the adjuster. And that simply means there's an additional thing to take into account in determining whether the unsupported code, in fact, is an overpayment. So fine. If they're right, they can take that into account. Okay. And then the last question is a follow-up on some of your dialogue with Judge Pillard. You gave two scenarios where you think things would be fair. I'm going to ask about the second one where the government continues to use in terms of setting the factors, what you say, the inaccurate data. I think... Tell me if this is your theory. Imagine there are 20 patients and with 20 diabetes codes. And we know that 16 of those are real. And four of those are over-reported. Now, imagine that traditional Medicare only catches a quarter of false codes. That means that 19 diabetes codes make it through the traditional Medicare data. Now, imagine that United catches three quarters of false codes. I think what you're saying is that United should be allowed to bill for all of the 16 true codes, of course. They should also be able to bill for the one false code that it didn't catch because, of course, they can't know that it's false. And of the three codes they did catch, they should be able to bill for two of those three. Now, that would come up to 19, which is the same number that made it into the traditional Medicare data of false codes. Now, my question is, is that your theory? And explain to me, if it is your theory, how that would be practical. That's it. Yeah, it's very complicated. But essentially, yes, that there has to be some accounting for the presence of codes that are unsupported in CMS's data. Again, in terms of practicality, our position- Let me make sure I have it right. So, if you catch three false codes, you would get to bill for two of them. And you wouldn't bill for one because traditional Medicare would have caught that one. Am I right about that? That's what you want the rule to be. That's the overpayment rule that you want to exist. Assuming that the first option you gave, Judge Pillard, isn't the option Medicare chooses. Okay. Assuming it doesn't go that route, then it has to figure out some way to do this. And the reason why there- Because I understand you said false code. It's easy to think of that- Overreported code. And we're so late in the time, I just- In the hypothetical where government catches one out of four false codes, you catch three out of four false codes, you would have to give back the money for one, but you would get to keep the money for two of the codes that you know are false. Is that your theory? That is one possibility. There are multiple ways an adjustment mechanism could work. It could work as a credit system on dollars. There's multiple ways CMS could solve this problem. It's really not that complicated for it to solve, but there are multiple ways you could solve it. Maybe not too complicated for you, but it's complicated for poor people like me who went to law school because there would be no math. Well, and I appreciate it, Your Honor, but here what the agency did is, we're not even going to try. We're not even going to consider to what extent our payments already account for and build in for this level of error. And even if you're right, United, that they build in fully for the errors in your data, it does not matter. Actuarial equivalence doesn't come into play and we get to make you return every one of those unsupported codes. And I think we gave an example of a 72-year-old female with multiple sclerosis and the unsupported diabetes code, which I think in one instance, that's a specific person. It's not population-wide, Judge Pillard. And it shows that even as to that one person, if you're not paid for that unsupported diabetes code, given the way the payments were set, you're going to be underpaid. All right. Let us conclude. Mr. Merritt, is there any essential point you need to make that's not in your brief or that you have not responded to in the question? No, thank you, Your Honor. You've been very generous with your time. Thank you. It's complicated, as you say. Okay. Counsel for appellants, why don't you take less than five minutes? Okay. Thank you very much. I do appreciate that. I'd like to begin with Judge Walker's hypothetical. I think that hypothetical accurately characterizes what United is asking for, which is sort of a free pass on errors that it discovers so that it can make up what it thinks it lost relative to what it should have had. But there's one missing aspect of that hypothetical, which is that in discovering those two or three invalid codes, UnitedHealth has to look at the medical record. And when they look at the medical record, they are also going to look for underreported codes, codes for diagnoses that are actually valid but were not previously reported. They say the coding intensity adjuster controls for that. You say that it doesn't. I'm not sure who's right yet. Okay. Yeah. I think it is true that the coding intensity adjustment accounts for the net effect, and it doesn't capture all of the increase that insurers are able to achieve. Something else I wanted to discuss is... Average effect, not the net effect. Right. The average net effect of having insurers both report additional diagnoses and delete invalid ones. So it's not just accounting for underreporting or overreporting. It's addressing both. I think in the end, what this comes down to is the secretary has substantial discretion to what factors need to go in, what needs to be adjusted for, and what does not. And the reason that UnitedHealth says that the secretary needs to do something in particular to take into account this effect that it's talking about is that it says that there is a fundamental asymmetry in treatment between traditional Medicare and Medicare Advantage. And that's just not true. In both cases, in both programs, all diagnosis codes need to be supported by medical record documentation. And there's actually even an overpayment rule that also applies to Parts A and B. So, for example, if a physician is treating in traditional Medicare, let's say Part B, if a physician is treating a patient for cancer or seeks reimbursement for that claim or else the claim will be rejected as not medically necessary. Now, if the physician collects payment for that treatment and it later turns out that the patient doesn't have cancer, then that payment is an overpayment and the physician has to give the money back. So that is the same rule that applies in Medicare Advantage. So the idea that there's fundamentally different treatment is just incorrect. And it certainly is not the case that Medicare Advantage insurers to catch all errors. I think what UnitedHealth wants to have is a system where they have a method of, they want to be able to say even after application of the risk adjustment model, according to all the rules that haven't previously been specified, according to the contracts that these insurers have signed, they want to be able to say that, well, there's this separate actuarially equivalent amount that exists independent of the risk adjustment model. And we want to be able to claim that amount. So we want to be able to say that the risk adjustment model produced a result that was too low, and now we want more money. And that's not how it works. The actuarial equivalence requirement is an instruction to the secretary. It is not an entitlement of any particular insurer to a particular amount of money. So finally, I think that the idea that CMS can't define something as an overpayment if, you know, in the event that all those overpayments were covered, that insurers would be underpaid, I think that's just wrong. Because the secretary obviously has to design the risk adjustment model to take into account the real world behavior of insurance companies, of beneficiaries, and so forth. And it is not the case that insurers are reporting all erroneous, or all the invalid codes, that they're finding them and reporting them, and they're not even coming close. And we know that from the record with respect to some of United's own plans. And finally, I just want to emphasize that there are always ways that the secretary can improve the risk adjustment model. Someone could say, well, medical costs are correlated with income, so you should have an income adjuster to take into account that maybe traditional Medicare patients have lower income than Medicare Advantage patients, or some Medicare Advantage plans have higher average income than others. And so, the secretary has to have discretion to be able to decide whether these adjustments make sense in any particular case. And that's, in fact, what the statute says. The statute says that the secretary may add to, will improve the determination of actuarial equivalence. Now, in this case, I think the secretary reasonably exercises discretion not to include the FFS adjuster. And there's neither empirical data, which it was United Health's burden to produce, that proves that this was impermissible, nor is there any logical or mathematical reason why the decision not to absent either of those things, there's no way United Health can sustain its claim. So, I should have asked this of Mr. Maron, actually, with the indulgence of Judge Rogers. Sorry about that. He also has a, but let me ask you, Mr. Shaw, is the elephant in the room here, the false claim back liability? Like, it kind of makes sense of what this case is about. And is it your understanding that a ruling on the statutory ground would bear on false claims back liability or not? I wouldn't characterize it as the elephant in the room. Certainly, the government has alleged that United Health has, you know, while mining medical records for additional diagnosis codes, in fact, found many of them and collected billions of dollars of payment for those codes, while at the same time, ignoring evidence that other codes were invalid. So, that's definitely, you know, the government stands by those allegations, but I don't think that's sort of the motivation for the government defending the overpayment rule here. But I think the real elephant in the room is that the overpayment rule reflects substantive requirements that have existed since the risk adjustment model. The requirement that ensures report diagnosis codes that are supported by medical record documentation and that CMS can collect payments or recover payments when those codes turn out to be invalid. So, I think that's the real elephant in the room, which is that if this court were to rule that this longstanding approach is impermissible, that would require really a drastic change to how CMS has operated the risk adjustment process for a long time. All right. Do either of my colleagues have any questions of counsel for CMS? Thank you, Mr. Shaw. Thank you. Judge Pillar, did you want to ask Mr. Marin this question about the elephant in the room? If you haven't answered either of the points that Mr. Shaw made about whether this is really about false claims act liability and what about the fact that this is really only the procedures that were added in the Affordable Care Act? Okay. So, let me address the second one, because that's a myth with respect to Mr. Shaw. The industry and CMS have had a disagreement on this issue since 2009 and towards the very beginning of the system. And there's been no subtle understanding on the relevant question. The relevant question being, does the existence of an unsupported code in itself mean you've overpaid? So, the answer to Judge Pillar's question is no. Correct. It's not a longstanding. I'd like to... No, no, no, no, no. The only question she asked, not reopening the entire argument, is the... I do not believe it's been a... The answer is no. It's not a longstanding interpretation. Can I cite to the... Oh, could I just finish? Oh, of course, Judge Rogers. The question she asked, and she can correct me if I'm misstating it, is, is false claims liability the elephant in the room? So, I thought to ask... You've got to understand why this case is before us in this posture. Okay. So, I think there were two questions. I was answering her second question about whether this was a longstanding interpretation. I'd love to hear your answer to the false claims liability. There's a lot of things that parties disagree on. This is one of them. The government's position is that a ruling in our favor on the statutory grounds would have absolutely no impact on the False Claims Act case. That's the government's position. We, depending on the scope of it, may disagree on that. What we don't disagree on is that there are certainly many ways the government, depending on its theory, can pursue False Claims Act claims against the industry or against participants in the industry, depending on the particular theory and the particular activity. I mean, it's a very broad question. There's lots of issues being litigated. I can't just say yes or no, but I know the government's position is it will have no effect. With respect to your second question, Judge, just very quickly, the current risk adjustment system was phased in from 2004 to 2007. That's your point, all right, that there's been this disagreement, all right? But we're going on and on and on here, and I don't think much clarity is being added by repetition. Thank you. In my opinion, if my colleagues disagree, let's question on. All right. Thank you very much, and thank you, Judge Rogers, for the extra time and the willingness of counsel to answer so many questions today. Of course. Thank you. Thank you very much. Thank you, Judge Rogers. Thank you. Let me just ask, Judge Walker, did you have anything? I don't. Thank you, Judge Rogers. All right. Thank you, counsel. We will take the case under advisory.
judges: Rogers, Pillard, Walker